UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OLIVIA YANCEY,

    Plaintiff,

v.

CANTERBURY ON THE LAKE NURSING
HOME and KRISTIE ARENS,

    Defendants.

                             /

Case No. 07-13626

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [25]**

This employment dispute comes before the Court on Defendants Canterbury on the Lake Nursing Home ("Canterbury") and Kristie Arens's motion for summary judgment. Plaintiff's complaint alleges that she was terminated from her position as a part-time Licensed Practical Nurse ("LPN") on September 19, 2005 because of her race and asserts claims of race discrimination in violation of 42 U.S.C. § 2000e-2(a)(1) ("Title VII"); 42 U.S.C. § 1981; and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.37.2101, *et seq.*[1] For the reasons stated below, Defendants' motion is GRANTED.

---

[1]Plaintiff's complaint also alleges claims of retaliation in violation of Title VII and Michigan's ELCRA. Despite her counsel's indication to defense counsel that she would likely voluntarily dismiss her retaliation claims (Mot. at 1 n. 1), Plaintiff's Response fails to do so or to otherwise address these claims. Because Plaintiff cannot establish her retaliation claims, they are hereby dismissed. Plaintiff conceded at her deposition that she had never complained to Defendants about being discriminated against because of her race or otherwise engaged in protected activity prior to her termination. (Yancey Dep. at 215-217.)

**I.     Facts**

Defendant Canterbury is located in Waterford, Michigan, and offers assisted living and 24-hour health services.  Plaintiff is an African-American, LPN who worked part-time at Canterbury from April 1995 until her termination on September 19, 2005.  (Yancey Dep. at 23-24.)  Canterbury's nurses are scheduled among three daily shifts:

| | | |
|---|---|---|
| Morning Shift | - | 7:00 a.m. to 3:30 p.m. |
| Afternoon Shift | - | 3:00 p.m. to 11:30 p.m. |
| Midnight Shift | - | 11:00 p.m. to 7:30 a.m. |

The Canterbury facility has three floors, and nurses on the midnight shift are typically assigned as follows:

| | | |
|---|---|---|
| 1st Floor | - | 1 nurse--Pods 1 and 2 (Medicare patients)<br>1 nurse--Pods 3 and 4 (Long term patients) |
| 2nd Floor | - | 1 nurse--Entire floor (Long term patients) |
| 3rd Floor | - | Same nurse as 1st Floor, Pods 3 and 4<br>(around 20 Alzheimer patients) |

(Yancey Dep. at 63-68.)

**A.  September 10, 2005**

The focus of this lawsuit is on the midnight shift that began at 11:00 p.m. on September 10, 2005.  Plaintiff was scheduled for that shift along with two other nurses:

| | | |
|---|---|---|
| 1st Floor | - | Francine Johnston--Pods 1 and 2 |
| | - | A. Lowes            --Pods 3 and 4 |
| 2nd Floor | - | Plaintiff Yancey |
| 3rd Floor | - | A. Lowes |

(Pl.'s Ex. D at 3.)  A. Lowes was an agency nurse.  Johnston and Plaintiff were Canterbury employees.

Francine Johnston, the charge nurse, arrived before 11:00 p.m. on September 10, 2005, to begin working the midnight shift.  She received keys to the third floor medicine cabinet from Mary Love, the nurse who had just finished working the afternoon shift on that floor.  (Johnston Dep. at 36-37, 41.)

Plaintiff also arrived before 11:00 p.m. on September 10, 2005 to begin working the midnight shift.  Shortly after her arrival, Plaintiff learned that Ms. Lowes, a nurse provided by a staffing agency, would not be reporting to work as scheduled.  (Yancey Dep. at 80-82.) Because the scheduled nurse was not coming in, Nurse Johnston informed Plaintiff that they would have to cover that absent nurse's duties.  Nurse Johnston stated that she would cover Pods 1 through 4 on the first floor, and Plaintiff would have to cover the patients on the second floor as well as the Alzheimer patients on the third floor.  (Pl.'s Ex. H, Johnston 9/13/05 written stmt.; Yancey Dep. at 86.)  Canterbury's existing protocol on that date supported this assignment of nursing duties:

> Review of midnight nurse assignments; 1 nurse on first floor medicare; 1 nurse on 1st floor longterm [sic] care and 3rd floor; and 1 on second floor.  In the event of a call-in on midnights, one nurse on 1st floor and one nurse covers 2nd and 3rd floors.

(Defs.' Ex. 4, Bates 377, 1/6/05 Nurses Meeting Agenda, Item 12; Arens Aff. ¶ 5.)  Plaintiff testifies that she was unaware of this protocol.  She also testifies that, in the event of a call-in, this is one solution the on-duty nurses adopted but insists there was no established protocol; rather, the nurses just worked out an arrangement that provided nursing coverage for all three floors.  (Yancey Dep. at 71-76, 79.)

3

Plaintiff wanted to do more to get another nurse in to cover for the absent agency nurse. She called Kathy Wright, the Canterbury nurse who was "on-call" on September 10, 2005, informed her of the agency nurse's absence, and told her that since she was assigned to the second floor, it would be too much for her to handle the third floor as well. Ms. Wright told Plaintiff to call other agencies and other Canterbury nurses to see whether another nurse was available and to let her know the result. Plaintiff agreed and hung up. (Pl.'s Ex. C, K. Wright 9/13/05 signed written statement; Yancey Dep. at 84-89.)

Plaintiff went down to the first floor where Nurse Johnston was working and told her what Wright had suggested. Another Canterbury nurse, Sue Zimmerman, was also present, having just completed the afternoon shift on the first floor. Nurse Zimmerman pointed out that other Canterbury nurses may not be available. In fact, she knew a male nurse had just worked a double (morning and afternoon) shift and had left early around 10:00 p.m. and thus would not be a likely call-in candidate. (Yancey Dep. at 88-90.)

Hearing this, Plaintiff told Nurse Johnston that she had to return to her work on the second floor and started towards the elevator. (Yancey Dep. at 89-90.) Plaintiff testifies that, when she did so, Nurse Johnston told her that she was not going to work the third floor, and Plaintiff then told Johnston that she had just explained to Nurse Wright "'that it would be too much for me to go up there' and I probably wouldn't even get up there is what I explained to Cathy [Wright]." (Yancey Dep. at 90.) Plaintiff then went on the elevator and began working. (*Id.*)

Although Plaintiff denies that she expressly refused to cover the patients on the third floor, her version of these events differs from that of the other nurses involved. Nurse Johnston reported that Plaintiff told her she would not work both floors "because she had

4

56 residents on the 2nd floor and 44 of them to give meds to in the morning." (Pl.'s Ex. H.) Nurse Wright reported that, during her telephone conversation with Plaintiff, "Olivia said that she 'would not take 3rd floor,' since she had to do 2nd floor and that it would be too much to take 3rd also." (Pl.'s Ex. C, Wright 9/13/05 signed stmt.) Nurse Zimmerman reported that:

> On September 10, 2005 at 11:40 P.M., Olivia Yancey came down from 2nd floor to talk to Fran Johnston about assignments. Fran told her that she would have to take 2nd and 3rd floors. Olivia responded, "I already told Cathy I was not doing it and I am not going to." She turned around and got on the elevator. I did not see her after that. I left at approximately [sic] 12:15 A.M.

(Defs.' Ex. 4, Bates 532, Zimmerman signed statement.)

It is not disputed that when Plaintiff left Nurse Johnston and returned to the second floor she had no intention of caring for the patients on the third floor in addition to her patients on the second floor unless she happened to get a call from one of the third-floor nurse's aides:

> Q: So when you got on the elevator, who was covering the third floor?
>
> A: Wasn't anybody up there but the two CENAs.[2]
>
> Q: So we've got a situation where the two nurses don't agree and the result is the third floor has no nurse, have I got that right?
>
> A: At that time, yeah. Yes, at that time, which was about 11:30 by that time or a little after 11:30.
>
> Q: And you just went to work?
>
> A: I went up on the second floor and started my assignment.
>
> Q: So what did think at that time was going to happen on the third floor?

---

[2] This is the abbreviation for Certified Equivalent Nursing Assistant.

> A: What did I think?
>
> Q: Yes. Weren't you concerned about the patients on the third floor?
>
> A: Oh, yeah, I already know that the aides up there know how to take care of the patients on the third floor even though there wasn't a supervisor there. And if they, they know if anything seriously happens to call one of us. They automatically know that regardless if there's a nurse up there or not.

(Yancey Dep. at 90-91.)

Plaintiff provided the same admissions when asked again about her intentions. She also conceded that she made no effort to inform the third-floor aides that there was no third-floor nurse for the midnight shift and made no effort to tell them whom to call if a medical situation occurred:

> Q: Okay. So when you got in the elevator from the first floor to go to the second floor –
>
> A: Yes.
>
> Q: -- your understanding at that time is that there's no nurse covering the third floor?
>
> A: Right.
>
> Q: Did you do anything to make sure that the patients were being covered on the third floor?
>
> A: No. I knew the staff was up there.
>
> Q: I didn't ask you why yet.
>
> A: Okay.
>
> Q: You did nothing?
>
> A: No, I didn't go up there, no.
>
> Q: You just assumed that the CENAs up there could handle it?
>
> A: No, not to handle the -- they can't handle any medical situation, no.

> . . .
>
> But anything that go on up there, then they know to call one of the nurses from second floor or first floor.
>
> Q: Did you call anybody on the third floor and tell them there wasn't going to be any coverage by a nurse on the third shift?
>
> . . .
>
> Q: When you're in the elevator and you know that there isn't going to be any help, do you contact anybody on the third floor to tell them that there's not going to be any help?
>
> A: No, they already knew wasn't nobody up there. When they got there, they knew . . . . that there was no nurse on there.

(Yancey Dep. at 94-97.)

After Plaintiff got on the elevator to go to the second floor, Nurse Johnston took further action. She called Nurse Wright at home, told her about her conversation with Plaintiff, told Wright that it would be too much for her to cover both the first and third floors because there was a resident on the first floor that was dying and a very needy patient on three. Nurse Johnston told Wright that she needed to call Kathy Jo Petrik, Canterbury's Director of Nursing, to get something done about the nursing shortage because Nurse Johnston needed to begin caring for the first floor patients and was also attempting to get more nurse's aides for the midnight shift. At that time, there was only one nurse's aide on the first floor and two on the second and more were needed in the building. (Johnston stmt.) Nurse Wright told Johnston that she would see what she could do and hung up. (Nurse Wright 9/13/05 stmt.) Shortly after this phone conversation, Nurse Johnston got the coverage she sought.

Nurse Wright proceeded to go into work at 12:00 a.m. to cover the midnight shift for the missing agency nurse. She met Nurse Johnston on the first floor. Nurse Johnston gave Wright a report on the residents Wright would be covering; and Nurse Wright took over nursing duties for the first floor, Pods 3 and 4, and the third floor. She did not talk to or see Plaintiff at any time during the evening. (*Id.*; Johnston stmt.)

### B. Subsequent Investigation

The above staffing problem was reported to Canterbury's administration, and an investigation ensued. It was reported that not enough nurses could be secured to cover the midnight shift on September 10, 2005, and that, as a consequence, Nurse Wright, who was on-call, was required to report to work. It was also reported that one or more nurses had refused to follow existing protocol dictating the proper manner of staffing in the case of a shortage of nurses.

The investigation was conducted by Kristie Arens, Canterbury's Director of Human Resources, and Kathy Jo Petrik, the Director of Nurses. (Arens Aff. ¶¶ 2-3.) Written statements were obtained from Nurses Zimmerman, Wright, and Johnston. Attempts were made to contact Plaintiff, however, contact was delayed because Plaintiff's phone was not in operation and she was not scheduled to work at Canterbury for a few days. (Arens Aff. ¶ 4.) Plaintiff received a letter informing her not to return to work until she spoke with either Director Arens or Petrik. She spoke with Petrik who asked her to prepare a written statement about the staffing problems on September 10, 2005. (Yancey Dep. at 111-14.)

Plaintiff gave Arens and Petrik her written statement when she met with them on September 19, 2005. In that signed statement, Plaintiff stated that, from the time she left Nurse Johnston and went on the elevator to continue her nursing duties on the second floor

8

(some time between 11:30 p.m. and midnight) until about 3:30 a.m. on September 11, 2005, she did not know that Nurse Wright had come in to cover for the absent agency nurse.

> About 3:30 a.m., I took a short break.  As I was returning back to 2nd floor, I seen [sic] Fran, and asked her did she have any extra tubings.  She stated no, but Kathy Wright was going to the Main Storage to get some.  <u>This was the first time that I had knowledge that Kathy Wright had come in the building to work. I never heard anything else from Fran or Kathy, until as I stated, I saw Fran in the hallway on 1st floor, that's when I found out Kathy Wright had come in to work.</u>  Kathy never called back to my knowledge or Fran never said anything else.

(Defs.' Ex. 4, Bates 537, Yancey written stmt. at 3 (emphasis added).)  In her written statement and during her meeting with Arens and Petrik, Plaintiff explained that she had told Nurses Johnston and Wright that patient demands on the second floor were too heavy for her to take on the added responsibilities of the third floor.  (Yancey stmt. at 3; Arens Aff. at ¶ 6.)  During this meeting, Plaintiff never questioned the protocol for nurse assignments when there is a call-in.  (Arens' Aff. ¶ 6.)

Following their discussion with Plaintiff, including her admissions that between 11:30 p.m. and 3:30 a.m. she was under the impression that no nurse was working on the third floor and during this four hour period Plaintiff made no attempt to check on the status of the third-floor patients, Directors Arens and Petrik made the decision to terminate Plaintiff.  (Arens Aff. at ¶ 7.)  They presented Plaintiff with a written notice that she was being terminated for violating company policy.  The violation was for "[f]ailure to ensure resident safety -- per protocol 2nd fl. nurse to take 3rd fl. nursing duties in event of a call in -- Ms. Yancey unaware of status of 3rd fl. residents until 3:30 a.m."  (Defs.' Ex. 4, Bates 540, Corrective Action Notice.)  Plaintiff refused to sign the notice, indicating under comments

9

that she "totally disagree[d]" with "this termination, only signing for a copy of this paper." (*Id.*)

At her deposition, Plaintiff testified that, when Arens and Petrik were preparing to leave their September 19, 2005 meeting with Plaintiff to make a decision about possible discipline, Arens asked Plaintiff "Do you have anything else to say before we make our decision?" Plaintiff responded then that she knew Nurse Wright was in the building before midnight but conceded that that was not what she put in her written statement.

> And she was standing up, I was sitting here and she was standing right there, she was standing over me and she said "Do you have anything else to say before we make our decision?" And I said . . . "I knew Cathy Wright was in the building before 12 o'clock." And she said, "Well, you didn't write it." And I said "No," and they left out, they come back and gave me the papers.

(Yancey Dep. at 125.) Plaintiff admits that she lied in her written statement. (Yancey Dep. at 118, 120-25, 149, 152, 171; Defs.' Ex. 4, Bates 550, Yancey 9/28/05 amendment to written stmt.)

About twenty minutes after the meeting where she was terminated, Plaintiff called Director Arens on the telephone explaining that she first learned that Nurse Wright was in the building around midnight because a nurse's aide, Sharon White, told her that she saw Wright around that time. Plaintiff further explained that she had lied on her written statement because she didn't want to "implicate" the aide. (Yancey Dep. at 128-32.) At her deposition, Plaintiff was unable to explain how the aide would be "implicated" if she had Plaintiff's permission to leave the second floor. (*Id.*)[3] Director Arens considered these new

---

[3]Plaintiff also provides an affidavit from the nurse's aide, Sharon White, who avers that "on September 10, 2005, before 12 midnight," she "went down to the first floor and saw Kathy Wright." (White Aff. ¶ 6.) The nurse's aide further avers that, after seeing Nurse Wright, she "immediately informed Ms. Yancey that Ms. Wright was here and that she did

10

contradictory facts to be a "self-serving reconstruction of the facts, especially since it relied upon my accepting the proposition that Ms. Yancey had initially lied to us in our investigation." (Arens Aff. ¶ 9.) The decision to terminate remained unchanged.

Plaintiff was informed of her appeal rights. She appealed the decision to terminate by taking the matter to Canterbury's Executive Director, Susan Dembiec, and provided Ms. Dembiec with an amended statement admitting that her earlier written statement was untrue and that the nurse's aide, Sharon White, had actually informed her that Nurse Wright was in the building around 12:15 a.m. (Arens Aff. ¶ 10; Yancey 9/28/05 Am. Stmt.) Plaintiff argued that she should not have been terminated, but she never alleged that she was a victim of race discrimination. (Yancey Dep. at 136; Yancey 9/28/05 Am. Stmt.) Following Ms. Dembiec's consideration, the decision to terminate was confirmed. Rather than appeal that decision further, Plaintiff filed a Charge of Discrimination with the Michigan Department of Civil Rights. The EEOC issued a Right to Sue letter on May 31, 2007, terminating its processing of Plaintiff's charge of race discrimination. (Compl., Ex. A.) Plaintiff then filed this complaint.

**II.   Summary Judgment Standard**

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c)

---

not have to go to the third floor." (S. White Aff. ¶ 7.)

mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Analysis

Plaintiff's complaint alleges that Defendants terminated her because of her race and asserts claims of race discrimination under Title VII, 42 U.S.C. § 2000e-2(a)(1), Michigan's ELCRA, and 42 U.S.C. § 1981. This matter is now before the Court on Defendants' motion for summary judgment arguing that Plaintiff cannot establish a *prima facie* case of employment discrimination under Title VII, ELCRA, or § 1981. This Court agrees with Defendants.

Claims of race discrimination brought pursuant to Michigan's ELCRA are analyzed under the same evidentiary framework as similar claims brought under Title VII. *Jackson*

v. *Quantex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). Likewise, "[t]he elements of [a] *prima facie* case as well as the allocations of burden of proof are the same for employment claims stemming from Title VII and § 1981." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) (internal quotation marks and citation omitted). To establish a *prima facie* case of employment discrimination under Title VII, the plaintiff must show that (1) she is a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position at issue, and (4) she was treated differently than similarly situated employees outside her protected class. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004). Defendants argue that Plaintiff has not and cannot establish the third and fourth elements of her claims. Defendants are correct as to the fourth element -- Plaintiff has not shown that she was treated less favorably than similarly situated white employees.

### A. Alleged Disparate Treatment

#### 1. Mary Love

To show disparate treatment, Plaintiff first alleges that, after she was terminated, her position was filled by a Caucasian nurse, Mary Love. Plaintiff is mistaken. The evidence proffered by the parties shows that Mary Love was already working at Canterbury before Plaintiff was terminated. In fact, Mary Love worked a double shift on September 10, 2005. She worked the morning shift on the first floor along with Nurse Zimmerman. She also worked the afternoon shift on the third floor, as reflected by the patient medical charts for that date, shift and floor. (Arens Aff. ¶ 15; Love Aff. ¶¶ 1-4; Ex. to Love Aff.; Pl.'s Ex. D, 9/10/05 Daily Staffing Sheets; F. Johnston Dep. at 62.)

#### 2. Francine Johnston

Plaintiff next attempts to show disparate treatment by arguing that she, an African-American nurse, was terminated whereas Francine Johnston, a Caucasian nurse, was not disciplined for similar conduct. The undisputed evidence shows otherwise. Similar to Plaintiff, Nurse Johnston complained that the patient load was too heavy and a third nurse was needed for the midnight shift on September 10, 2005. Unlike Plaintiff, however, Ms. Johnston did accept the added responsibility for patients in Pods 3 and 4 on the first floor when the agency nurse did not show up for the midnight shift. Unlike Plaintiff, Ms. Johnston did not simply go off to perform her originally assigned duties. Not satisfied with leaving the third floor patients unattended, after Plaintiff left on the elevator, Ms. Johnston made another call to Nurse Wright in an attempt to get coverage for the absent agency nurse. This call resulted in Nurse Wright reporting to work. (Johnston and Wright stmts.) Moreover, unlike Plaintiff, during the investigation of the staffing issues on that date, Ms. Johnston did not lie. Rather, she accurately informed Directors Arens and Petrik that she saw Nurse Wright as soon as she arrived around midnight, gave Ms. Wright a report on the patients she would be attending to, and knew that Nurse Wright would be assuming the nursing duties for all the patients in Pods 3 and 4 on the first floor and those on the third floor. (*Id.*; Wright Dep. at 14-16; Arens Aff. ¶ 13.)

Plaintiff is also mistaken when she argues that Nurse Johnston should have been but was not disciplined for allowing the afternoon nurse on the third floor to leave early and did nothing to address the absent agency nurse until Plaintiff became involved. The undisputed evidence presented by both parties shows that (1) Nurse Johnston was proactive in finding a replacement for the missing midnight nurse; (2) Mary Love was the afternoon nurse on the third floor; and (3) when Mary Love left after working both the

morning and afternoon shifts on September 10, 2005, she gave the keys to the third-floor medicine cabinets to Nurse Johnston who was on the first floor preparing for her midnight shift.

### 3. Michael Faulman

Finally, Plaintiff attempts to show disparate treatment by arguing that a male, Caucasian nurse, left patients unattended and failed to ensure resident safety but was treated more favorably than Plaintiff. Once again Plaintiff misconstrues the undisputed record evidence. Michael Faulman, a male Canterbury nurse, also worked both the morning and afternoon shifts on September 10, 2005. Contrary to Plaintiff's arguments here, he did not work the afternoon shift on the third floor. Rather, he worked on the first floor along with Nurse Susan Zimmerman. He left that shift early, at 10:17 p.m., because he was ill. His patients, however, were not left unattended. Nurse Zimmerman covered his patients until her shift was completed and Fran Johnston arrived for the midnight shift. (Arens Aff. ¶ 14; Pl.'s Ex. B, A.M. Nurse Schedule; Pl.'s Ex. D, 9/10/05 Daily Staffing Sheets; Pl.'s Ex. J, Faulman Timecard.)

Plaintiff presents no evidence from which a reasonable juror could conclude that she was treated less favorably than similarly situated employees outside her protected class. She thus fails to establish the fourth element of her *prima facie* case. Even if Plaintiff had established a *prima facie* case of race discrimination, she cannot show that Defendants' legitimate, nondiscriminatory reason for terminating her was a pretext for race discrimination.

### B. Burden-Shifting and Pretext

Plaintiff presents no direct evidence that she was terminated because of her race. Nonetheless, circumstantial evidence may be used to establish her claim of race discrimination. Circumstantial evidence is "analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006). This burden-shifting framework first requires the plaintiff to establish a *prima facie* case. Once that is accomplished, "the plaintiff is entitled to a presumption that the defendant discriminated against him or her in violation of Title VII." *Id.* at 706-07. The burden then shifts to the defendant "to put forth a legitimate, nondiscriminatory reason for the complained of adverse treatment." *Id.* "If the defendant meets this burden, the presumption of discrimination . . . falls away and the plaintiff then needs to show that the defendant's legitimate nondiscriminatory reason was a pretext for discrimination." *Id.*

Defendants have presented evidence supporting their legitimate, nondiscriminatory reason for terminating Plaintiff; e.g., that during their investigation, Plaintiff presented a written statement admitting that, between 11:30 p.m. and 3:30 a.m. on the midnight shift on September 10/11, 2005, she was under the impression that no nurse was working on the third floor and that she made no attempt to make sure those patients were cared for during those four hours, and then subsequently admitted that she lied in her written statement. (Arens Aff. ¶¶ 7-9.) Plaintiff argues that this reason is a pretext for race discrimination. She makes this argument despite her repeated admissions that she did not complain of race discrimination to anyone at Canterbury before, during, or after her

termination or at any time during her employment with Defendant Canterbury. (Arens Aff. ¶¶ 8, 11; Yancey Dep. at 57-60, 134-36, 182, 210.)

Plaintiff may establish pretext by showing that Defendants' proffered reasons for her termination "(1) ha[ve] no basis in fact; (2) did not actually motivate the adverse employment action; or (3) w[ere] insufficient to warrant the adverse action." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). Plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008) (internal quotation marks and citation omitted).

There is no genuine issue of material fact regarding pretext. Plaintiff has not presented evidence showing that Defendants' reasons for terminating her (1) had no basis in fact; (2) did not actually motivate that decision; or (3) were insufficient to warrant that decision. First, Plaintiff concedes that her initial written statement reported that she was unaware of the fact that Nurse Wright had arrived to cover the patients on the third floor until 3:30 a.m.. She also concedes that she lied in that written statement. Thus, she cannot establish pretext by showing that the reasons Defendants provided for her termination had no basis in fact. Second, she presents no evidence that race actually motivated the decision to terminate. In fact, she conceded that (1) during her ten year employment with Canterbury, she never made complaints of race discrimination to anyone; (2) she did not complain of race discrimination during the investigation that led to her termination; and (3) did not complain of race discrimination during her internal appeal of that decision.

17

Finally, Plaintiff attempts to show that Canterbury's reliance on the protocol for nursing assignments when a nurse on the midnight shift calls in or is otherwise absent is insufficient to warrant her termination. Plaintiff's argument fails for several reasons. It ignores that Defendants' decision to terminate was based on the facts as reported in her initial written statement and her subsequent admission that she had lied in that written statement. These facts alone, without considering Plaintiff's knowledge of the subject protocol or its existence, are sufficient to support the decision to terminate. Plaintiff's personal beliefs to the contrary are not enough to establish pretext. "Mere personal beliefs, conjecture and speculation are insufficient to support an inference of [race] discrimination." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 584 (6th Cir. 2003) (internal quotation marks and citation omitted). Moreover, as discussed above, Plaintiff presents no evidence showing that other similarly situated Canterbury employees outside her protected class were treated more favorably in similar circumstances. Accordingly, she presents no evidence from which a reasonable jury could infer that the reasons provided for her termination were merely a pretext for racial animus.

**IV. Conclusion**

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.

        s/Nancy G. Edmunds  
        Nancy G. Edmunds  
        United States District Judge

Dated: April 16, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 16, 2009, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer  
        Case Manager